******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., with whom ROBINSON, C. J., and MUL-LINS, J., join, dissenting. As a matter of good government, I have no quarrel with the majority's conclusion that the result it reaches today advances a legitimate and even praiseworthy public policy. If a residential landlord who pays the utility bill for a multiunit apartment building desires to recoup those expenses from its tenants,[1] I may agree that enlightened public policy should require the landlord to do so by imposing "consistent and predictable payments [on each tenant] each month" rather than charging the tenants variable monthly amounts that will increase when other tenants "use more utilities than anticipated each month . . . ." After all, a tenant in one unit has no control over the use of utilities by other tenants in other units, and it seems sensible to me that tenants with parsimonious habits in this respect should not suffer financial uncertainty each month due to the unpredictable behavior of other tenants who may have more extravagant usage habits. But we are construing a statute, not enacting one. The most basic principles of statutory construction prohibit us from substituting our own policy preferences, however commendable, for the policy choices made by the legislature. The public policy that the majority identifies as dispositive in this case is nowhere to be found in the statute under construction, General Statutes § 16-262e (c).

The manifest legislative objective of § 16-262e, reflected in every one of its provisions, is to protect tenants by preventing utility companies from shutting off service to a residential building when the landlord

---

[1] For the sake of simplicity, I use the words "landlord" and "tenant" throughout this opinion to refer to the relevant actors. The actual terms in General Statutes § 16-262e are "owner, agent, lessor or manager" and "occupant," respectively. The words I use are not perfectly synonymous with the statutory terms, but any technical differences have no relevance to the present case.

fails to pay a utility bill for which it is liable. *Nothing* in the statute contains any suggestion, express or implied, that the legislature intended either to prohibit a landlord from recovering its utility expenses from its tenants or, alternatively, to regulate the recoupment methodology used by the landlord to recover those expenses. The statute, in short, is aimed at solving the problems that arise when landlords do not pay their utility bills; it has nothing to say about the issues that may arise when landlords fulfill their obligations to pay those bills, which is the scenario involved in the present case.

As will become apparent, the plain language of § 16-262e, the structure of the statute, and its relationship to other statutes all lead to the conclusion that § 16-262e does not regulate the means by which a landlord may recoup its utility costs from its tenants. Indeed, even the majority acknowledges, as it must, that a landlord's recoupment of utility costs from the tenant is proper under the statute. What the majority fails to acknowledge is that the line it draws between permissible and impermissible methods of recoupment is nowhere to be found in the statute or the public policy animating its enactment. The public policy that the majority reads into the statute may be a good one, but it is not our role to promulgate that policy. I respectfully dissent.

I

I agree with the majority that the proper construction of § 16-262e is a question of law over which our review is plenary. Analysis of the statute must begin with its language and relationship to other statutes. See General Statutes § 1-2z.

The majority focuses its attention on the language in § 16-262e (c) providing that a landlord "shall be liable" for the costs of utilities, "except for any service furnished to any dwelling unit of the building on an individ-

ually metered or billed basis for the exclusive use of the occupants of that dwelling unit . . . ." The majority seems to find this language to be ambiguous because it is unclear whether the landlord's statutory liability prohibits the landlord from recouping its utility costs from tenants utilizing the "ratio utility billing" (RUB) method, whereby the landlord pays the utility service provider directly and thereafter bills its tenants individually for their estimated proportionate share of the total payment under the terms of the rental agreement. In light of this perceived ambiguity, the majority deems it necessary to consult the legislative history and public policy underlying the statute. Using as its springboard the premise that § 16-262e is a remedial statute that must be construed broadly, the majority concludes that a landlord may not recover its utility expenses from its tenants under RUB because, in the majority's words, the statute prohibits tenants from being "held liable *to anyone* for the cost of a utility that he or she has not exclusively used." (Emphasis in original.)

The majority's broad construction of § 16-262e (c) is inconsistent with the plain and unambiguous language of the statute, the larger statutory scheme established by the legislature in § 16-262e, and the relevant provisions of title 47a of the General Statutes governing landlord-tenant relations. It also is internally inconsistent with the majority's own conclusion that a landlord is not prohibited from recovering its utility expenses from a tenant using the so-called "building in" method of cost recovery.[2] The reality is that, so long as the landlord pays its utility bills, nothing in our statutes prevents the landlord from recovering those utility costs from its tenants under the terms of a rental agreement,

---

[2] "Building in" is a recoupment method under which the landlord estimates monthly utility costs in advance and then, without separately itemizing or identifying those costs, incorporates them into the total amount of rent due under the terms of the rental agreement.

regardless of whether the charges are calculated using the RUB method, the "building in" method, or some other method of recoupment that is not prohibited by law.

Section 16-262e contains eight subsections, (a) through (h), and, before more closely examining the text of subsection (c), the central provision at issue, it is useful to review the whole statute to better understand its manifest purpose and scope. Subsection (a) sets forth the most fundamental prohibition in the statute, which provides that the utility company "shall not terminate [utility] service for nonpayment of a delinquent account owed to such company" by the landlord. General Statutes § 16-262e (a). This provision applies to the termination of services for any "residential dwelling" in a building not occupied exclusively by its owner when the utility company "has actual or constructive knowledge that the occupants of such dwelling are not the individuals to whom the [utility] company . . . usually sends its bills . . . ." General Statutes § 16-262e (a). In other words, if the utility bill is sent to the landlord, service to the tenants may not be terminated as a result of the landlord's failure to pay the bill.

Subsection (a) contains a single exception, which permits termination of such services when the utility company "(1) . . . makes a good faith effort to notify the occupants of such building of the proposed termination by the means most practicable under the circumstances and best designed to provide actual notice; and (2) . . . provides an opportunity, where practicable, for such occupants to receive service in their own names without any liability for the amount due while service was billed directly to the lessor, owner, agent or manager and without the necessity for a security deposit; provided, if it is not practicable for such occupants to receive service in their own names, the [utility] company . . . shall not terminate service to such resi-

dential dwelling but may pursue the remedy provided in sections 16-262f and 16-262t."[3] General Statutes § 16-262e (a). Upon due notice, service to the building may be terminated if the tenants are given an opportunity to receive service in their own names and it is practicable to provide service by that method.

The remainder of the statute fills in the details. Subsection (b) specifies that, if service was erroneously terminated under subsection (a) because of a mistaken understanding about who gets billed, the utility company must reinstate service upon learning that the tenants "are not the individuals to whom it usually sends its bills . . . ." General Statutes § 16-262e (b). Subsection (c), which I will discuss in more detail in part II of this opinion, provides the way to determine whether the landlord or tenant is liable to the utility company for payment—the landlord is responsible for such payment, unless the utility "service [is] furnished to any dwelling unit of the building on an individually metered or billed basis for the exclusive use of the occupants of that dwelling unit . . . ." General Statutes § 16-262e (c). Subsection (c) also provides that, if the landlord "fails to pay" for utilities when it is required to do so, the tenants may arrange to receive service in their own names and "may deduct, in accordance with the provisions of subsection (d) of this section, a reasonable estimate of the cost of any portion of such service which is for the use of occupants of dwelling units other than such occupant's dwelling unit." General Statutes § 16-262e (c).

---

[3] General Statutes § 16-262f (a) (1) permits the utility company to "petition the Superior Court or a judge thereof, for appointment of a receiver of the rents or payments for use and occupancy or common expenses . . . for any dwelling for which the owner, agent, lessor or manager is in default." Accord General Statutes § 16-262t (a) (1) (water companies). The utility company can recover its expenses, any arrearages, and reasonable fees and costs from the money held by the receiver. See General Statutes § 16-262f (a) (4); see also General Statutes § 12-262t (a) (5).

Subsection (d) provides that payments made by a tenant to the utility company pursuant to subsection (a) or (c) of the statute (i.e., payments made by the tenant to the utility company for services that are the landlord's obligation to pay) may be deducted by the tenant "from any sum of rent or payment for use and occupancy due and owing or to become due and owing to the" landlord. General Statutes § 16-262e (d). Subsection (e) requires the utility company to provide notice to each tenant of their right to deduct from rent the amount of any utility payments made by the tenant to a utility company in the event that a landlord's failure to pay its utility bills requires a tenant to arrange for service in their own name pursuant to subsection (a). See General Statutes § 16-262e (e). Subsection (f) prohibits a landlord from increasing rent "in order to collect all or part of that amount lawfully deducted by the occupant pursuant to this section." General Statutes § 16-262e (f). Subsection (g) requires a landlord to provide utility companies access to meters located on the premises. See General Statutes § 16-262e (g). Finally, subsection (h) provides that nothing in the statute "shall be construed to prevent" a utility company or tenant "from pursuing any other action or remedy at law or equity that it may have against the" landlord. General Statutes § 16-262e (h).

It is obvious that § 16-262e has nothing to say about a landlord's ability to recover its duly paid utility costs from its tenants. The statute is concerned with landlords who do *not* pay their utility bills, not with landlords who *do* pay their utility bills and thereafter seek to recoup those expenses from the tenants who receive the utility service. It is for this reason that the statute is focused on two things: (1) the landlord's obligation to pay the utility company, and (2) the utility company's affirmative obligation to facilitate the tenants' efforts to avoid termination of services resulting from the land-

lord's nonpayment. The statute thus requires landlords to pay the utility bills (unless separately metered or billed) and imposes consequences if it fails to do so.[4] The obligations of the utility company are also central to the statutory scheme—the utility company is prohibited from terminating utility services for nonpayment except as specified, and it is required in various ways to accommodate the needs of tenants whose landlords fail to pay their utility bills. By contrast, the statute refers not at all to the rights of a landlord to recover its utility costs when the landlord *does* pay its utility bills, which is the only issue presented in this case.

---

[4] Section 16-262e (c) permits tenants to engage in self-help by arranging to receive utility service in their own names and deducting the estimated amount of other tenants' utility expenses from the rental payments owed to the landlord. This is an exceptional remedy because landlords and tenants alike generally are forbidden from engaging in self-help in the event of an alleged breach of a duty owed by one to the other. See, e.g., General Statutes §§ 47a-12, 47a-14h, 47a-15, 47a-15a and 47a-43. In particular, a tenant normally may not unilaterally decide to withhold rent, or any part thereof, on the basis of an allegation that the landlord has failed to perform legal duties owed to the tenant. See General Statutes § 47a-14h (a) and (h). Thus, a tenant who claims a right to rent abatement based on substandard dwelling conditions generally is limited to the remedies available in § 47a-14h, which requires the aggrieved tenant to institute an action in the Superior Court and to pay the full amount of rent with the clerk of the court while that action is pending. See General Statutes § 47a-14h (a) and (h). I am aware of only two exceptions in title 47a to the general prohibition against tenants engaging in self-help, one of which is similar to § 16-262e, in that it permits the tenant to procure essential services if the landlord breaches its obligation to do so and allows the tenant to deduct the cost of those services from the rent. See General Statutes § 47a-13 (a) (1) ("[i]f the landlord is required to supply heat, running water, hot water, electricity, gas or other essential service, and if the landlord fails to supply such essential service and the failure is not caused by conditions beyond the landlord's control, the tenant may give notice to the landlord specifying the breach and may elect to . . . procure reasonable amounts of heat, hot water, running water, electric, gas or other essential service during the period of the landlord's noncompliance and deduct the actual and reasonable cost of such service from the rent"). The other exception permits a tenant to cease making rental payments if the dwelling is "damaged or destroyed by fire or other casualty to an extent that enjoyment of the dwelling unit is substantially impaired" due to no fault of the tenant. General Statutes § 47a-14 (a).

## II

In light of the foregoing statutory framework, the meaning of subsection (c) could not be more clear. Subsection (c) provides that "[t]he owner, agent, lessor or manager of a residential dwelling *shall be liable* for the costs of all electricity, gas, water or heating fuel furnished by a public service company, electric supplier, municipal utility or heating fuel dealer to the building, except for any service furnished to any dwelling unit of the building on an individually metered or billed basis for the exclusive use of the occupants of that dwelling unit, provided an owner, agent, lessor or manager *shall be liable* for service provided on an individually metered or billed basis pursuant to subsection (g) of this section from ten days after the date of written request by the company, supplier, utility or dealer if the company, supplier, utility or dealer is denied access to its individual meters or other facilities located on the premises of the building. Such owner, agent, lessor or manager *shall only be liable* when such owner, agent, lessor or manager controls access to such individual meters to which access is denied. If service is not provided on an individually metered or billed basis and the owner, agent, lessor or manager *fails to pay* for such service, any occupant who receives service in his own name may deduct, in accordance with the provisions of subsection (d) of this section, a reasonable estimate of the cost of any portion of such service which is for the use of occupants of dwelling units other than such occupant's dwelling unit." (Emphasis added.) General Statutes § 16-262e (c).

The meaning of this language is unmistakable. It provides that a landlord who does not individually meter or bill utilities for a tenant's exclusive use "shall be liable" for the costs of the building's utility expenses. General Statutes § 16-262e (c). The meaning of the term "liable" in this context is plain and unambiguous: the

landlord is legally responsible to pay for the cost of utility services provided to residential dwellings that are billed using a master meter. To whom is the landlord liable? The answer is equally clear: the landlord is liable to the utility company. In this regard, I perceive no ambiguity in the statute whatsoever. Logic dictates that the liability could not run to anyone else but the utility company because the service is provided by the utility company and the debt is owed to the utility company. The statute contains no suggestion of any other possibility. Indeed, as I previously discussed, the entire statute is directed to one end, which is to prevent the utility company from terminating service to tenants as a result of the landlord's failure to pay its bills. The risk of termination arises only when *the utility company* is not paid, and it therefore makes perfect sense that the liability at issue is the obligation to pay *the utility company.*

The majority contends that the term "liable" is ambiguous because § 16-262e (c) creates an exception to the landlord's liability when a tenant's utilities are serviced on an individually metered or billed basis, and the majority therefore finds it unclear whether the tenant's liability is owed to the utility company or the landlord. From this premise, the majority concludes that the statute is ambiguous "[b]ecause the language of the statute and the dictionary definitions of 'liable' do *not* specify to whom a tenant would have to be liable to violate the statute . . . ." (Emphasis in original.) I am unable to make sense of this argument. The fact that the tenant may be liable to the utility company under specified circumstances (i.e., when the unit is individually metered or billed) gives rise to no ambiguity about the identity of the obligee, that is, the entity to whom the liability runs. Whether the liable party is the landlord or the tenant, the payment obligation referred to in § 16-262e (c) unequivocally is the obligation owed to the

utility company. This point is obvious not only from the statutory text, but also upon examination of the statute as a whole, the manifest purpose of which is to ensure that the landlord's failure to pay the utility company does not result in the termination of service to the tenants.[5]

Nor can the majority import ambiguity from the fact that § 16-262e (c) permits a tenant, in the event a landlord fails to meet its utility payment obligations, to pay the utility company directly and then to deduct from rent "a reasonable estimate of the cost of any portion of such service which is for the use of occupants of dwelling units other than such occupant's dwelling unit." Nothing in this provision creates any ambiguity about what the statute means when it provides that the landlord "shall be liable" for utility costs billed on a master meter, or about whether the statute permits a landlord to recoup its duly paid utility costs from its tenants. The provision serves only to support the conclusion that the payor may recoup the costs spent on behalf of others who benefit from the utility service, which is precisely what landlords do when they recoup

---

[5] Indeed, careful examination reveals that not one word in the statute imposes liability on the tenant. Section 16-262e (c) provides that a landlord "shall be liable" and, in certain circumstances "shall only be liable," but it does not use the term "liable" in connection with tenants. No doubt, the tenant is liable for his or her own exclusive utility usage when that usage is individually metered or billed. But, unlike the provisions addressing the landlord's obligations, which expressly impose liability on the landlord, the statute does not expressly impose liability on the tenant. The reason it does not do so is that the statute is not concerned with the tenant's failure to meet his or her payment obligations; the tenant's nonpayment does not result in the evil addressed by the statute, which is termination of service to all tenants as a result of the landlord's failure to pay its liabilities. Subsection (h), which refers only to the right of recovery against the landlord, illustrates this point. See General Statutes § 16-262e (h) ("[n]othing in this section shall be construed to prevent the company, electric supplier, municipal utility, heating fuel dealer or occupant from pursuing any other action or remedy at law or equity that it may have against the" landlord).

their utility costs using either the "building in" or RUB methodology.

There is additional evidence demonstrating that the statute is unambiguous as it relates to the ability of a landlord to recover its duly paid utility expenses from its tenants. Landlord-tenant relations are governed primarily by title 47a of the General Statutes, and it is unthinkable that the legislature would include in title 16 a provision prohibiting recoupment without simultaneously ensuring that such a provision is fully consistent with the bedrock terms of landlord-tenant law set forth in title 47a. See, e.g., *State* v. *Bemer*, 339 Conn. 528, 541, 262 A.3d 1 (2021) ("[t]he legislature is always presumed to have created a harmonious and consistent body of law . . . [so that] [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction" (internal quotation marks omitted)). General Statutes § 47a-3 provides that "[a] landlord and a tenant may include in a rental agreement terms and conditions not prohibited by law, including rent, term of the agreement and other provisions governing the rights and obligations of the parties." General Statutes (Supp. 2024) § 47a-4[6] then lists the terms that are prohibited in any rental agreement. Relevant to the present case is § 47a-4 (a) (10), which provides that "[a] rental agreement shall not provide that the tenant . . . agrees to pay a heat or utilities surcharge if heat or utilities is included in the rental agreement." The only plausible construction of this provision is that a landlord is permitted to include a provision in the rental agreement that operates to recover its utility costs from its tenants, so long as the landlord does not add a surcharge. No one in the present case

---

[6] Hereinafter, all references to § 47a-4 are to the version of that statute in the 2024 supplement to the General Statutes.

claims that the RUB recoupment method constitutes a surcharge under § 47a-4 (a) (10).

In fact, it is undisputed that utility costs can be included as a part of rent or charged as a separate item under the rental agreement. General Statutes (Supp. 2024) § 47a-1 (h) defines "[r]ent" as "all periodic payments to be made to the landlord under the rental agreement." Consistent with this definition, Connecticut law permits private parties to include in their rental agreement the tenant's obligation to pay the cost of utilities, as well as other costs incidental to the maintenance and ownership of the property. See *Presidential Village*, *LLC* v. *Perkins*, 332 Conn. 45, 59, 209 A.3d 616 (2019) (recognizing that private parties, unlike landlords receiving subsidies from federal Department of Housing and Urban Development, are "free to define 'rent' as they see fit"); *Elliott Enterprises*, *LLC* v. *Goodale*, 166 Conn. App. 461, 463–64, 142 A.3d 335 (2016) (defining rent to include "FIXED MINIMUM MONTHLY RENTAL . . . together with the TENANTS' pro-rata share of . . . UTILITIES" (emphasis omitted; footnote omitted; internal quotation marks omitted)).

Despite all of this, the majority concludes that periodic payments to the landlord under the rental agreement using the RUB methodology are utility payments prohibited by statute, rather than payments to cover the landlord's utility costs, because the monthly amounts are not "consistent and predictable" in advance. But nothing in Connecticut law imposes these requirements if the rental agreement provides otherwise. See General Statutes § 47a-3. Landlords and tenants are permitted to include in their rental agreement any terms and conditions on which they agree, so long as those terms and conditions are "not prohibited by law . . . ." General Statutes § 47a-3. The RUB recoupment method is not prohibited by title 47a or § 16-262e. It is that simple.

It is also self-evident that RUB does not require a tenant to pay the costs attributable to other tenants' utility consumption any more than does the "building in" method deemed acceptable by the majority. To the contrary, the "building in" method likely results in less accurate cost calculations because it is based on historical data rather than actual current utility costs. Moreover, the "building in" approach provides landlords with an incentive to overestimate their monthly utility costs to safeguard against the possibility that they will be required to absorb the cost of unexpected increases in utility prices or usage. Although neither method allocates utility costs among tenants strictly on the basis of actual, exclusive usage per tenant, that is a feature common to both methods and plainly cannot be used to justify deeming one method lawful and the other legally prohibited.

For the foregoing reasons, it is clear to me that § 16-262e (c) plainly and unambiguously does not prohibit a landlord from recouping its utility costs via the RUB methodology. Although the statute "is remedial in nature and must be construed broadly to that end . . . [w]e are not free . . . to create ambiguity when none exists; in other words, we cannot accomplish a result that is contrary to the intent of the legislature as expressed in the [statute's] plain language." (Internal quotation marks omitted.) *Vincent* v. *New Haven*, 285 Conn. 778, 792, 941 A.2d 932 (2008); see also *State* v. *Orr*, 291 Conn. 642, 654, 969 A.2d 750 (2009) ("our case law is clear that ambiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation"). Stated another way, a reviewing court cannot "torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity . . . ." (Internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 698, 710, 980 A.2d 880 (2009). The language of § 16-262e leaves no room for ambiguity,

and the majority's expansive construction of the statute is unwarranted.

Finally, even if I were to conclude that the statute is ambiguous and therefore agree that it is proper to resort to extratextual evidence of legislative intent, I would arrive at the same result. The legislative history reflects that § 16-262e was intended to impose liability on the landlord for utility services delivered to a multiunit apartment building with a master meter and thereby prevent the utility company from terminating service due to the landlord's failure to timely pay the utility bill. It was contemplated that landlords paying such utility costs could and would recoup those costs from their tenants by charging higher or additional rent. For example, Attorney Raphael L. Podolsky of the Legal Services Training and Advocacy Project, one of the drafters of the bill, testified that, "[i]f, for whatever reason, the building is so constructed [so as to make individual metering impracticable], or the [master] metering system is so arranged, you can't [individually meter each unit], then that [utility service payment] becomes a landlord responsibility. *The landlord* [*builds*] *the costs to that into the rent, so for example . . . where there's a central furnace in a* [*multifamily*] *building, the landlord would pay for the heat, and he would obviously include heat in the rent. The rent is going to be higher in that kind of a building.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Energy and Public Utilities, Pt. 1, 1984 Sess., p. 387. Podolosky further explained that the statute "*does not in any way preclude a property owner from charging a tenant for heat or other utilities.*" (Emphasis added.) Id., 459. Thus, the legislature did not intend to bar landlords from recovering their utility costs by billing tenants for a reasonable estimate of their individual utility usage, regardless of whether that estimate is arrived at

by using the RUB method, the "building in" method, or some other recoupment method.

I recognize that there may be sound public policy reasons to prohibit or limit a landlord's use of the RUB recoupment method. As the majority points out, RUB does not result in "consistent and predictable payments each month and places the risk that the tenants may use more utilities than anticipated each month" on a tenant who "has no control over the utility usage of other units within the building . . . ." However, it is up to the legislature, not the courts, to determine whether to bar the use of the RUB recoupment method or to impose statutory protections restricting its implementation. See, e.g., Ariz. Rev. Stat. Ann. §§ 33-1314.01 and 33-2107 (2021); Md. Code Ann., Real Prop. § 8-212.4 (c) and (d) (LexisNexis Supp. 2023); Minn. Stat. Ann. § 504B.215 (2a) (West 2023); N.M. Stat. Ann. § 47-8-20 (F) (Cum. Supp. 2015); Or. Rev. Stat. § 90.562 (2023); Va. Code Ann. § 55.1-1212 (D) (2022).[7] See generally *Jobe* v. *Commissioner of Correction*, 334 Conn. 636, 659, 224 A.3d 147 (2020) (observing that "the primary responsibility for formulating public policy must remain with the legislature" (internal quotation marks omitted)); *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." (Internal quotation marks omitted.)).

For the foregoing reasons, I respectfully dissent.

---

[7] The majority notes that "several states have legislation that explicitly permits the use of RUB" and "provide numerous protections for tenants." It appears, however, that several states, such as California, Georgia, Indiana, Illinois, Nevada, Pennsylvania, and Washington, do not have statutes that expressly permit or limit the use of RUB, but landlords in those states employ the RUB methodology to recoup their utility costs from tenants. See National Conference of State Legislatures, Utility Submetering (last updated January 15, 2016), available at https://www.ncsl.org/energy/utility-submetering (last visited April 29, 2024); see also Synergy Utility Billing, Our Services: RUBS Billing, available at https://www.synergyutilitybilling.com/services/rubs-billing/ (last visited April 29, 2024).